**CHILD EVANGELISM FELLOWSHIP OF NEW JERSEY, INC., et al., Plaintiffs,**

v.

**STAFFORD TOWNSHIP SCHOOL DISTRICT, et al., Defendants.**

**Civil Action No. 02–4549(MLC).**

United States District Court, D. New Jersey.

Dec. 10, 2002.

the financial information produced to this Court, a $2,500 surety constitutes sufficient security in this case.

Gregory J. Sullivan, Hartsough, Kenny & Chase, Trenton, NJ, Nathan A. Adams, IV, Religious Liberty Advocates, Annandale, VA, for Plaintiffs.

Arthur Stein, Stein, Supsie & Hoffman, Forked River, NJ, for Defendants.

## MEMORANDUM OPINION

COOPER, District Judge.

This is an action to enjoin a school district from denying a religious organization, *inter alia,* access to certain elementary schools to promote meetings and activities. The original complaint in this matter was filed pursuant to 42 U.S.C. §§ 1983 and 1988 for deprivations of plaintiffs' rights secured by the First and Fourteenth Amendments of the United States Constitution. (Compl. at 2.) Plaintiffs also brought claims under parallel provisions of

the New Jersey Constitution. (*Id.* at 10–11.) The matter now comes before the Court on an Order to Show Cause as to why a preliminary injunction should not be issued. For the reasons stated herein, we will grant, in part, the Order to Show Cause.

## BACKGROUND AND PROCEDURAL HISTORY

### I. The Parties

Plaintiff Child Evangelism Fellowship of New Jersey, Inc. ("CEF–NJ") is a non-profit corporation affiliated with Child Evangelism Fellowship, Inc. ("CEF"), a "non-profit inter-denominational religious organization," establishing clubs known as Good News Clubs ("Clubs") at schools around the country. (Mem. in Supp. of Pls.' Applic. for an Order to Show Cause with Temp. Restraints ("Temp. Restraint Mem.") at 7.) The Clubs provide religious instruction to children ages six to twelve, whose parents grant permission. (*Id.* at 7–8.) Plaintiff Child Evangelism Fellowship of New Jersey, Inc., Bayshore Chapter acts on behalf of CEF–NJ, sponsoring Clubs at various school districts including defendant Stafford Township School District ("school district").[1] (*Id.* at 7.)

According to CEF's Mission Statement, it is a "Bible-centered, worldwide organization composed of born-again believers whose purpose is to evangelize boys and girls with the Gospel of the Lord Jesus Christ and to establish (disciple) them in the Word of God and in a local church for Christian living." (Defs.' Exs. in Opp. to Prelim. & Perm. Inj. ("Defs.' Exs."), Ex.

X, CEF Fact Sheet.) CEF flyers are more lighthearted in tone, emphasizing that children will learn "biblical principles, moral values, character qualities, [and] respect for authority" through Bible lessons, missionary stories, singing, and other activities.[2] (Pls.' Certif. of Exs., Ex. H; Pls.' 2d Certif. of Exs., Ex. N.) Local Director Bruce Wood ("Wood") describes CEF as a "non-profit [organization] that seek[s] to foster self-esteem in youth and to instill or cultivate morals and character in children, as well as to provide a positive recreational experience." (Pls.' 2d Certif. of Exs., Ex. L, Wood Decl.)

The school district consists of four schools, two of which are at issue: (1) the Ocean Acres Elementary School ("Ocean"), attended by pupils ages three to seven, and (2) the McKinley Avenue Elementary School ("McKinley"), attended by pupils ages eight to ten. (Defs.' Mem. of Law in Opp. to Prelim. & Perm. Inj. ("Defs.' Opp.") at 1.) The school district maintains written policies on both the distribution of materials to pupils and the use of facilities by community groups and agencies. (Pls.' Certif. of Exs., Exs. A & E.) In addition, the school district has developed practices of allowing particular groups to (1) post flyers on school walls, (2) post flyers on school bulletin boards, and (3) staff tables and post flyers at Back–to–School Nights. (*See Factual Background and Proc. Hist.*, Part IV, *infra.*)

### II. CEF's Requests of the School District

CEF requested permission in February 2002 to use school district facilities at both

---

**1.** Hereinafter, we will use the abbreviation "CEF" when referring to the collective and individual actions of plaintiffs and the abbreviation "the school district" when referring to the collective and individual actions of defendants.

**2.** Some of the flyers are directed at children, while others are directed at parents. (*See, e.g.*, Pls.' Certif. of Exs., Ex. H; Pls.' 2d Certif. of Exs., Ex. N.) As CEF requires parental permission for participation in all Club meetings and activities, however, parents, not children, are the relevant audience. (*See* Temp. Restraint Mem. at 8.)

Ocean and McKinley for after-school Club meetings. (Temp. Restraint Mem. at 9.) At the same time, CEF asked that faculty at both schools distribute flyers and permission slips to pupils. (*Id.*) Later that month, the superintendent allegedly approved CEF's request to use school facilities, but denied the distribution request, on the belief that this would violate the Establishment Clause. (*Id.* at 9–10.)

CEF contacted the school district again on May 17, 2002, requesting personnel to (1) post a new flyer on school bulletin boards; (2) distribute flyers and permission slips to pupils; (3) allow CEF to staff tables at Back–to–School Nights and disseminate materials, including permission slips, to parents attending the events; and (4) permit students to distribute CEF materials to other students on school grounds during the school day.[3] (Compl. at 7; Defs.' Opp. at 1.) On June 10, 2002, the school district rejected these requests, responding that CEF's original application and proof of insurance to use the facilities were not received. (Temp. Restraint Mem. at 11; Compl. at 8.) CEF then sent these materials on August 13, 2002. (*Id.* at 8.) When the school district failed to timely respond to this correspondence, CEF sent another letter on September 9, 2002. (*Id.* at 8–9.) The school district responded on September 12, 2002, but did not offer a final decision on CEF's requests. (*Id.* at 9.) Because the Back–to–School Nights were scheduled for September 18 and September 24–25 at McKinley and Ocean, respectively, CEF sent a letter to the school district on September 13, 2002, advising that CEF would seek immediate injunctive relief. CEF then sought a Temporary Restraining Order and Order to Show Cause from this Court. (*Id.*; Defs.' Opp. at 17.)

### III. *School District's Written Distribution Policy*

According to the school district's written distribution policy,[4] all materials distributed by faculty to students must be approved in advance by the superintendent and "should relate to school matters or community activities." (Pls.' Certif. of Exs., Ex. A.) In addition, the activities promoted in distributed literature must be "directly associated with the children who are enrolled in" the school district. (*Id.*) The policy forbids (1) the use of pupils "to distribute partisan information pertaining to a school or general election, budget or bond issue, or negotiations," and (2) the exploitation of pupils "for the benefit of any individual, group, or profit-making organization." (*Id.*)

The policy also expresses "the board's commitment to assist all organizations in our rapidly growing community." (*Id.*) Particular non-profit organizations "permitted to distribute information to go home with children" are specified. (*Id.*) These are the Parent–Teachers Association ("PTA"), the school district Athletic Association, the Boy Scouts, the Girl Scouts, the Four–H Club, the Southern Regional High School, the Lions Club, the Civil Defense, the school district Township Fire Department, the Elks, and "other groups [that] will be added at (sic) discretion of the superintendent." (*Id.*) "All oth-

---

**3.** CEF has agreed to supply materials to faculty for distribution to students, in the same manner that other materials are distributed. As there is no evidence that the school district allows students to distribute materials to other students during the school day, this request is moot. (Tr. of Oral Arg. dated 10–29–02 ("Tr.") at 51–52.)

**4.** We will refrain from discussing the school district's written policy on use of facilities by community groups and agencies. The parties agree that CEF's use of the facilities for after-school meetings is no longer in dispute. (Defs.' Opp. at 1.)

er associations must receive special approval from the board of education." (*Id.*) The written distribution policy contains no guidelines on posting flyers in the school or participating in Back-to-School Nights.

### IV. *The School District's Practices*

#### A. *Distribution of Materials by Faculty to Students ("Distribution Forum")*

Teachers at both Ocean and McKinley comport with the distribution policy by handing out various materials approved by the superintendent, "usually at the close of the school day, immediately prior to dismissal." (Pls.' Certif. of Exs., Ex. C, Defs.' Resps. to Interrogs., No. 4(c); *see* Defs.' Opp. at 7–8.) Generally, organizations produce flyers or other information at their own expense and then place these materials in faculty mailboxes. (Pls.' Certif. of Exs., Ex. C, Defs.' Resps. to Interrogs., No. 4(g).) The faculty, in turn, distributes materials to students as they are received; there is no regular distribution schedule. (*Id.* at No. 4(b))

The school district contends that flyers are limited to information related to "registration in community groups and/or events sponsored by them that complement the school's curriculum, relate to issues of health and/or safety, or which provide recreational activities." (Defs.' Opp. at 8.) In addition, the schools allegedly do not distribute flyers from groups providing "structured formal teaching sessions" or discussion on "topics such as spirituality and satan." (*Id.*) The school district has permitted distribution of materials by, among others, the Cub Scouts, the Girl Scouts, the Stafford Township Municipal Alliance Committee ("Municipal Alliance"), various athletic and sports teams, the Ocean County Library, the Stafford Township Volunteer Fire Company, the PTA, College Funding 101, Habitat for Humanity, and "a limited number of civic groups."

(Defs.' Opp. at 8; Pls.' Reply to Defs.' Mem. in Opp. ("Pls.' Reply") at 9; Pls.' Certif. of Exs., Ex. C, Defs.' Resps. to Interrogs., No. 3(a).)

Some organizations, such as the Stafford Wrestling Club, provide flyers promoting purely recreational activities. (*See* Defs.' Exs., Ex. N.) Others furnish materials to educate pupils about health and safety. For example, the school district Township Volunteer Fire Company flyer promotes its "Annual Fire Safety Poster Contest." (*Id.*, Ex. L.) Other organizations advance activities for character building and moral and social development through their flyers. Handouts from the Girl Scouts, for example, express the organization's aims of instilling "leadership, values, social conscience, and conviction about their own self-worth" in young girls. (*Id.*, Ex. P.) Examples of Girl Scouts activities include field trips, skill-building clinics, community service projects, cultural exchanges, and environmental stewardships. (*Id.*)

#### B. *Materials Posted on School Bulletin Boards During School Hours "Bulletin–Board Forum"*

The school district maintains bulletin boards at both Ocean and McKinley, which are allegedly not for public use, including (1) a bulletin board used by the PTA, but not intended to provide information to students, (2) a bulletin board in the faculty room used by the Stafford Township Education Association (STEA) for position postings and professional materials, and (3) a bulletin board located outside the nurse's office, containing information from area hospitals on health and safety issues. (Defs.' Opp. at 4–5; Pls.' Certif. of Exs., Ex. C., Defs.' Ans. to Interrogs., No. 10.) In addition, each school has a "Greeter's Table" at the main entrance, where visitors sign in. (Defs.' Opp. at 5.) Next to the Greeter's Table is another table con-

taining information for parents from the New Jersey Education Association and the Parent Institute, regarding such topics as homework and reading. (*Id.*)

### C. Materials Posted on School Walls During School Hours ("School–Wall Forum")

The school district also has permitted various organizations to hang posters and flyers on the walls of both Ocean and McKinley. (Pls.' Certif. of Exs., Ex. C, Defs.' Resps. to Interrogs., No. 11.) Such organizations include the Rotary Club, various theater groups, the Children's Hospital of Philadelphia, the American Society for the Prevention of Cruelty to Animals, and the United States Marine Corps' Toys–for–Tots program. (*Id.*)

### D. Back–to–School Nights ("Back–to–School–Night Forum")

Both Ocean and McKinley host Back–to–School Nights each fall. (Defs.' Opp. at 6.) This year, the school district permitted four entities to staff tables and disseminate information to parents at both Ocean's and McKinley's Back–to–School Nights. (*Id.* at 7.) These were the Ocean County Library System, Municipal Alliance, the PTA, and the school district itself. (*Id.*) In addition, a conglomeration of community organizations promoting "Extreme Event," a sporting demonstration of bikers, in-line skaters, and skateboarders, staffed a table at Ocean. (*Id.*) The school district concedes that other organizations, such as the Boy Scouts, may have displayed flyers at Back–to–School Nights this year and staffed tables in previous years. (Pls.' Certif. of Exs., Ex. C, Defs.' Resps. to Interrogs., No. 8(a) & (b).)

### V. Procedural History

CEF filed a complaint on September 19, 2002. (Compl.) On September 24, 2002, we denied CEF's request for temporary restraints, but issued an Order to Show Cause as to why a preliminary injunction should not be issued, enjoining the school district from denying CEF's requests to (1) "leave flyers on tables" at Back–to–School Nights, (2) have the schools send CEF's permission slip and flyer home with pupils, and (3) "post [CEF's] flyer (sic) wherever other non-profit community organizations post their materials." (*See* Order to Show Cause dated 9–24–02.) We held oral argument on October 29, 2002, wherein the parties agreed that neither further discovery nor an evidentiary hearing would likely affect the outcome of our determination on the merits of their claims. (Tr. at 20–23 & 43–44.)

In support of the application for a preliminary injunction, CEF argues that the school district engaged in discriminatory treatment in violation of the Free Speech Clause and the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. CEF further contends that the school district's distribution policy is unconstitutionally overbroad and void for vagueness. The school district disputes these contentions and further argues that CEF cannot satisfy the requirements for injunctive relief.[5]

### DISCUSSION

### I. Jurisdiction

The Court has subject matter jurisdiction over CEF's federal constitutional and statutory claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The Court has supplemental jurisdiction over CEF's

---

5. The school district contended initially that certain CEF flyers violated federal and state anti-survey statutes. (Defs.' Opp. at 63.) As

CEF has offered to redact these flyers, this issue is now moot. (*Id.*)

claims arising under the New Jersey Constitution pursuant to 28 U.S.C. § 1367(a).

## II. *Ripeness*

█ The school district argues that CEF's claims are not ripe for judicial review, because CEF failed to exhaust administrative remedies. (Defs.' Opp. at 21–22.) Because exhaustion of state administrative remedies is not a prerequisite to an action under 42 U.S.C. § 1983, we find that CEF's federal constitutional and statutory claims are ripe for review.[6] *Patsy v. Bd. of Regents*, 457 U.S. 496, 500, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

## III. *Preliminary Injunction Standard*

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988) (citing *United States v. City of Philadelphia*, 644 F.2d 187, 191 n. 1 (3d Cir.1980)). When determining whether to grant preliminary injunctive relief, the Court must consider whether: (1) the party seeking such relief has shown a reasonable probability of success on the merits; (2) the party will be irreparably injured by denial of the relief; (3) granting such relief will result in even greater harm to the nonmoving party; and (4) granting such relief will be in the public interest. *See, e.g., ACLU v. Reno*, 217 F.3d 162, 172 (3d Cir.2000); *ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc)

(citations and quotation omitted). When relevant, a Court must also consider possible harm to interested third parties. *See, e.g., Oburn v. Shapp*, 521 F.2d 142, 152 (3d Cir.1975). "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *Amer. Telegraph & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994) (citations omitted).

## IV. *Reasonable Probability of Success on the Merits: Free Speech Clause; Free Exercise Clause; Equal Protection Clause; and Vagueness*

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982). In evaluating whether a moving party has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Oburn*, 521 F.2d at 148 (citations omitted).

We are required to examine, at least on a preliminary basis, (1) whether the school district's denial of CEF's requests violated (a) the Free Speech Clause of the First Amendment, (b) the Free Exercise Clause of the First Amendment, or (c) the Equal

**6.** We need not address whether CEF's state constitutional claims are ripe for review, because we conclude that (1) CEF is entitled to injunctive relief with respect to the distribution, school-wall, and Back–to–School–Night fora on the basis of the federal constitutional and statutory claims, and (2) CEF is not entitled to injunctive relief with respect to the school-bulletin-board forum despite the state constitutional claims. In any event, CEF made several attempts to obtain a final decision from the school district before seeking

injunctive relief. In addition, the school district's policy states that unlisted groups will be added at the "discretion of the superintendent," and that they must "receive special approval from the board of education." (Pls.' Certif. of Exs., Ex. A.) It is not clear that CEF could appeal the superintendent's decision to the board of education, as opposed to board-of-education approval being an additional requirement. Thus, even if CEF were required to exhaust state administrative remedies, we find that CEF has done so.

Protection Clause of the Fourteenth Amendment; and (2) whether the school district's distribution policy is unconstitutionally vague or overbroad on its face.

## A. *Free Speech Clause*

■ The Free Speech Clause of the First Amendment requires the State to provide private citizens access to its property for expressive purposes in certain circumstances. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). It is well established that free speech rights are implicated in public schools; "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In addition, religious speech is protected to the same degree as other types of speech. *Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

## 1. *Overview on Forum Analysis*

■ The extent of a particular entity's right to free speech depends upon the nature of the government forum at issue.[7] *Perry,* 460 U.S. at 44–46, 103 S.Ct. 948. Government fora have been divided along a continuum on the basis of the State's right to limit expressive activity. *Id.* At one end of the spectrum are traditional public fora, such as "streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* (quoting *Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). In such "quintessential public forums" the State may not exclude communicative activity based on its content, unless it can show that its regulation is "necessary to serve a compelling state interest and that it is narrowly tailored to achieve that end."[8] *Id.*

7. The school district argues that forum analysis should not apply, because CEF asks for access not to school facilities, but to school personnel and communication systems to reach students. (Defs.' Opp. at 49.) The only authority CEF cites for this proposition is *Berger v. Rensselaer Cent. Sch. Corp.,* 982 F.2d 1160 (7th Cir.1993). That case, however, is inapposite. The *Berger* court was asked whether a school violated the Establishment Clause by allotting class time for the Gideons, a religious group, to distribute bibles and encourage pupils to study them. *Id.* at 1165–66. The school allowed the Gideons to command the undivided attention of the students during instructional time. *Id.* The *Berger* court was not convinced by the school's argument that the Free Speech Clause *required* it to accommodate the Gideons in that way. *Id.* Here, CEF is requesting the same rights as other groups in a neutral forum. *See Hedges v. Wauconda Cmty. Sch. Dist. No. 118,* 9 F.3d 1295, 1299 (7th Cir.1993)(distinguishing *Berger* on ground that school there "crossed the line" between neutrality and preferential

treatment). Moreover, the usual goal of a group requesting access to a forum under the First Amendment is to gain access to an audience, not merely to use physical space. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 826 & 836, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (university violated free speech rights of group by refusing to fund journal "encouraging students to consider what a personal relationship with Jesus Christ means").

The school district also argues that forum analysis should not apply, because elementary schools are closed fora and, therefore, permitted to discriminate against religious organizations. (Defs.' Opp. at 48–49.) As we will discuss later in this opinion, public schools are not per se non-public fora. *See* note 11 *infra.* Moreover, even in non-public fora, the government is not permitted to engage in religious viewpoint discrimination. *See Discussion* Part II.A.3 *infra.*

8. "The state may also enforce regulations of the time, place, and manner of expression

At the other end of the spectrum are non-public fora, which are neither traditionally open to the public nor designated by the government as such. *Id.* The government may issue content-based regulations on communicative activity in non-public fora, provided they are "reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.*

■■■ Between traditional and non-public fora, courts have recognized "designated" and "limited" public fora. *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 345–46 (5th Cir.2001).[9] The government creates a designated public forum by "intentionally open[ing] a nontraditional public forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The State's right to restrict a speaker's access to a designated forum is subject to the same scrutiny applicable in a traditional public forum. *Perry*, 460 U.S. at 45, 103 S.Ct. 948 ("[t]he Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place").

■■■ A limited public forum is one that the government opens to particular types of communicative activity, on the basis of subject matter or speaker identity.[10] *Milford*, 533 U.S. at 107, 121 S.Ct. 2093 (citing *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510). The State's right to restrict a speaker's access to a limited public forum is subject to the same scrutiny applicable in a non-public forum. *Id.* (citing *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439). Thus, a court must determine whether restrictions are viewpoint neutral and reasonable in light of the purpose served by the forum. *Id.*

### 2. Type of Forum Created

■■■ Elementary schools are not traditional public fora. *See Perry*, 460 U.S. at 46–47, 103 S.Ct. 948; *Gregoire*, 907 F.2d at 1371. The more difficult question is whether the school district has established either designated or limited public fora at Ocean and McKinley. In addressing this question, we consider (1) government intent and (2) the nature of the property at issue and its consistency with expressive activity. *Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439; *Gregoire*, 907 F.2d at 1371;

which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Because the school district does not argue that the restrictions are content-neutral, we need not address the issue.

9. The distinctions among designated, limited, and non-public fora have been somewhat confused by the courts. While some opinions have used the terms "designated" and "limited" interchangeably, *see, e.g., Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 304, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), others have accorded them distinct constitutional scrutiny. *See Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (1995); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). Addressing this con-

fusion, the Fifth Circuit stated: "Because the level of scrutiny applied to government regulation of speech in a 'limited public forum' differs from that applied to regulation of speech in a 'designated public forum,' it now seems clear that the two terms are not synonymous and should not be used interchangeably." *Chiu*, 260 F.3d at 346. We find this analysis persuasive and will conduct our forum analysis accordingly.

10. Earlier precedents have simply identified such fora as non-public. *See Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439; *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1371 (3d Cir.1990). The distinction is merely a matter of terminology, as the courts applied the same standard and analysis. *Compare Milford*, 533 U.S. at 107, 121 S.Ct. 2093, *with Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439, *and Gregoire*, 907 F.2d at 1371.

*Christ's Bride Ministries v. Southeastern. Pa. Transp. Auth.*, 148 F.3d 242, 249 (3d Cir.1998).

There are four fora at issue: (1) the distribution forum; (2) the school-wall forum; (3) the Back–to–School–Night forum; and (4) the school-bulletin-board forum. In determining whether the school district intended to create a designated or limited public forum with respect to any of these four, we consider both policy and practice. *Gregoire*, 907 F.2d at 1372. Our consideration of the nature of the property at issue depends upon whether "the principal function of the property would be disrupted by expressive activity." *Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439. While courts have been somewhat reluctant to hold public schools as limited or designated public fora, the idea that a public school can open itself for public speech is not a foregone conclusion. *See Milford*, 533 U.S. at 106–07, 121 S.Ct. 2093 (parties conceded that school created limited open forum in elementary school after hours); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 268, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ("school facilities may be deemed to be public fora"); *Bd. of Educ. of Westside Comm. Schs. v. Mergens*, 496 U.S. 226, 244, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) ("A public secondary school cannot simply declare that it maintains a closed forum and then discriminate against a particular ... group on the basis of the content of the speech of the group"); *Bender v. Williamsport Area Sch. Dist.*, 741 F.2d 538, 547–49 (3d Cir.1984), *vacated on other grounds*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (although educational mission of high school generally more circumscribed than university, school district can and did establish limited public forum for student groups to meet during school day); *Gregoire*, 907 F.2d at 1378 (same for student groups meeting after school hours).[11]

**11.** The school district argues that public elementary schools during school hours are per se non-public fora. (Defs.' Opp. at 48–49.) We disagree. The cases relied on in support of this proposition apply *Cornelius* terminology, identifying fora that limit speech based upon subject matter or speaker identity as non-public fora, but applying the same analysis used in *Milford* for limited public fora. *See* note 10 *supra; see also Deeper Life Christian Fellowship, Inc. v. Bd. of Educ.*, 852 F.2d 676, 679–80 (2d Cir.1988); *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1539 (7th Cir.1996). Thus, the schools in these cases actually established limited public fora under *Milford* terminology. *See* note 10 *supra* and accompanying text. The restrictions were constitutional and not viewpoint discriminatory, because, unlike three of the fora here, the fora did not permit speech similar to the prohibited speech. *See Discussion* Part II. A.3 *infra; see also Deeper Life*, 852 F.2d at 680; *Muller*, 98 F.3d at 1539; *cf. Walz v. Egg Harbor Township Bd. of Educ.*, 187 F.Supp.2d. 232 (D.N.J.2002) (pupil could not distribute holiday gifts with religious messages, because no other pupils distributed messages on gifts and forum therefore non-public).

Moreover, the fora at issue here are no less consistent with expressive activity than the after-school forum addressed in *Milford*, because they similarly do not occur during instructional time. *See* 533 U.S. at 106–07, 121 S.Ct. 2093. The United States Supreme Court has held that a public high school opened its address system, annual club fair, bulletin board, and school newspaper as limited open fora under the Equal Access Act ("the Act"). *Mergens*, 496 U.S. at 247, 110 S.Ct. 2356; 20 U.S.C. §§ 4071–4074 (making it unlawful for any public secondary school "which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to ... any students who wish to conduct a meeting within that limited open forum on the basis of the religious ... content of the speech at such meetings"). The Court came to this conclusion even though the Act's requirements only apply to instructional time. 20 U.S.C. § 4071(b). Although the Act is not presently at issue, this precedent indicates that the fora at issue here (1) exist during non-instructional time; and (2) are consistent with the function of a public school. *Cf. Hazelwood*, 484 U.S. at 268–270, 108 S.Ct. 562 (holding public high school's newspaper is non-public forum

a. *Distribution, School–Wall, and Back–to–School–Night Fora*

 We find that the school district's distribution, school-wall, and Back–to–School–Night fora are likely limited public fora.[12] We need not, however, conclusively determine this issue, because (1) the same analysis applies whether the school district has established a limited or a non-public forum, and (2) even assuming all three of these fora are non-public, we preliminarily conclude that the school district impermissibly discriminated against CEF based upon religious viewpoint with respect to each. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 391–92, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

b. *School–Bulletin–Board Forum* [13]

The school district has no written policy on use of school bulletin boards. In prac-

where its production was "part of the educational curriculum and a regular classroom activity"). That the schools at issue here are elementary schools, not high schools, does not change this outcome; age is of little relevance, where, as here, the speech is directed at the parents, not the students. *See Milford*, 533 U.S. at 115, 121 S.Ct. 2093.

12. With regard to the distribution forum, the school district's distribution policy requires all distributed information to be "directly associated with the children," and forbids materials from profit-making and partisan organizations. (Pls.' Certif. of Exs., Ex. A.) The distribution policy lists particular organizations whose flyers can be distributed and maintains the school district's discretion over other materials by requiring superintendent approval. (*Id.*) CEF has offered no evidence that the school district has failed to adhere to this policy in practice. Accordingly, the school district has likely opened a forum for distribution, but limited it by subject matter and speaker identity. *See, e.g., Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439 (government limited forum through consistent policy of restricting participation to appropriate agencies and requiring permission).

With regard to the Back–to–School–Night and school-wall fora, the school district maintains no written policy. In practice, the school district has required prior superintendent approval before granting access. (Pls.' Certif. of Exs., Ex. C, Defs.' Resps. to Interrogs., Nos. 8, 11.) However, the school has established no clear criteria and fails to maintain records regarding which groups have been denied access. (*Id.*) The school district recalls once denying the Boy Scouts access to Back–to–School Night, because of space considerations, but admits to having allowed the Boy Scouts to participate in the past. (*Id.* at No. 8.)

The government cannot close a forum by simply maintaining discretion over it. *See Christ's Bride Ministries, Inc.*, 148 F.3d at 251 (reserving "the right to reject [material] for any reason at all does not signify, in and of itself alone, that no public forum has been created.") Moreover, "[s]tandards for inclusion and exclusion in a limited public forum 'must be unambiguous and definite' if the 'concept of a designated open forum is to retain any vitality whatever.'" *Id.* (quoting *Gregoire*, 907 F.2d at 1375). Accordingly, the school district's practice seems to indicate an intention to open the school-wall and Back–to–School–Night fora for at least the same degree of use by the public as the distribution forum.

As previously stated, however, courts are unlikely to presume that a public secondary or elementary school would open its doors to indiscriminate use by the public and thereby establish a designated public forum. The school district seems to group the Back–to–School–Night and school-wall fora together with the distribution forum, by stating that none of these fora permit political or commercial materials. (Pls.' 2d Certific. of Exs., Ex. C, Defs.' Ans. to Interrogs., No. 5.) As CEF has pointed to no political or commercial materials that have been permitted in these fora, the school district has likely limited these fora accordingly.

13. Because we find that the school district's restrictions with respect to the school-bulletin-board forum were neither unreasonable nor viewpoint discriminatory, *see Discussion* Part II.A.3.d *infra*, we must address whether this forum is either designated, on the one hand, or limited or non-public, on the other. We need not, however, determine whether it is limited or closed, because the same analysis applies regardless. *See Discussion* Part II.A.1 *supra*.

tice, however, the school district contends, and CEF has not disputed, that there are three bulletin boards used exclusively by the PTA, the STEA, and area hospitals. (Defs.' Opp. at 4; Pls.' Certif. of Exs., Ex. C., Defs.' Ans. to Interrogs., No. 10.) Accordingly, the school district has demonstrated an intention to maintain either a closed or limited public forum with respect to use of school bulletin boards.

### 3. Applying Limited/Non-public Forum Analysis

■■■■ Government restrictions on speech in both limited and non-public fora must be viewpoint neutral and reasonable in light of the purpose served by the forum. *Perry,* 460 U.S. at 44–46, 103 S.Ct. 948; *Milford,* 533 U.S. at 107, 121 S.Ct. 2093. Prohibited viewpoint discrimination includes restrictions based upon the religious nature of speech. *Milford,* 533 U.S. at 105–12, 121 S.Ct. 2093 (resolving conflict among the Courts of Appeals). Thus, where a group seeks to speak on a "subject otherwise permissible" in a particular forum, but from a religious standpoint, the government cannot constitutionally exclude the speech. *Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. 2141 (school permitting organizations to speak about child rearing and families in after-school forum could not prohibit group presenting films on same topics from religious standpoint); *Milford,* 533 U.S. at 108–09, 121 S.Ct. 2093 (holding forum permitting any group promoting the "moral and character development of children," could not restrict access to Good News Clubs, because they promot-

ed same goals); *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510 (university could not deny funding to journal presenting religious viewpoints).

■■■■ We conclude that it is likely that the school district discriminated against CEF based upon religious viewpoint with regard to the distribution, school-wall, and Back–to–School–Night fora.[14] *See Discussion* Part II.A.3.a-c *infra.* We also find, however, that it is likely that the school district's restriction against CEF in the school-bulletin-board forum was both non-discriminatory and reasonable. *See Discussion* Part II.A.3.d *infra.*

### a. Distribution Forum

CEF requested to speak on a topic otherwise permissible in the school district's distribution forum, but from a religious perspective. The school district's written distribution policy permits any materials relating to school matters or community activities, so long as they are not partisan or profit-making. (Pls.' Certif. of Exs., Ex. A.) In addition, the nonexclusive list of permitted groups includes, among others, the Girl Scouts, which has flyers advertising children's activities to promote character building and moral and social development. (*Id.;* Defs.' Exs., Ex. P.)

CEF is a group that, like the Girl Scouts, promotes children's activities for character building and social development. (Pls.' Certif. of Exs., Exs. H, L & N.) That CEF does so through bible instruction or "quintessentially religious programs" indicates not that the speech relates to a different subject matter, but only that CEF speaks on similar topics from a religious standpoint.[15] *See, e.g., Milford,* 533 U.S.

---

**14.** Because we find that restrictions in these fora were viewpoint discriminatory, we need not address whether they were reasonable. *See Milford,* 533 U.S. at 107, 121 S.Ct. 2093.

**15.** The school district argues that none of the three fora accommodate groups promoting "structured formal teaching sessions" or discussion on "topics such as spirituality and

Satan." (Defs.' Opp. at 8.) The school district further states: "It cannot be disputed that *no other group* to which the District has granted access, including the Cub Scouts and Girl Scouts, has as its primary purpose the goal of evangelizing and discipling children." (*Id.*) The *Milford* court addressed this very argument when it held that the school district

at 108–12, 121 S.Ct. 2093. Accordingly, like the school districts in *Milford, Rosenberger,* and *Lamb's Chapel,* we find it likely that the school district has engaged in unconstitutional viewpoint discrimination by denying CEF access to the distribution forum.

b. *Back–to–School–Night Forum*

We also reach the preliminary conclusion that CEF's speech is permissible in the school district's Back–to–School–Night forum. The school district's practice has been to allow a variety of groups access to the Back–to–School–Night forum, without maintaining records of which groups have been denied. (Pls.' Certif. of Exs., Ex. C, Defs.' Resps. to Interrogs., No. 8.) Moreover, the school district admits to having possibly permitted the Boy Scouts, which has goals and activities similar to both the Girl Scouts and CEF, to post flyers on a table at Back–to–School Nights. (*Id.*) Thus, we find it likely that the school district engaged in viewpoint discrimination by excluding CEF from the Back–to–School–Night forum.

c. *School–Wall Forum*

This Court further concludes, at this preliminary stage, that CEF's speech is similarly permissible in the school-wall forum. The school district has no clear policy for limiting access to this forum and cannot point to any particular group that has been denied access. (*Id.* at No. 11.) Rather, a conglomeration of unrelated organizations promoting, *inter alia,* charities and recreational activities have been permitted to post flyers on school walls. (*Id.*) Moreover, the school district does not distinguish the criteria for access to the school-wall forum from the distribution and Back–to–School–Night fora. (Defs.' Opp. at 52–58; Defs.' Reply at 9–15.) Nor does the school district indicate that groups promoting character building and moral and social development, such as the Girl Scouts and Boy Scouts, would be excluded. (*Id.,* Defs.' Opp. at 52–58.) Accordingly, we reach the preliminary conclusion that the school district has discriminated against CEF on the basis of religious viewpoint by denying access to this forum.

d. *School–Bulletin–Board Forum*

The school district, however, has limited access to bulletin boards to particular organizations and subject matters, to which CEF does not conform. CEF is not akin to the PTA, the STEA, or a local hospital. (Defs.' Opp. at 4; Pls.' Certif. of Exs., Ex. C., Defs.' Ans. to Interrogs., No. 10.) Accordingly, we do not find it likely that the school district engaged in viewpoint discrimination by excluding CEF from the school-bulletin-board forum.

Moreover, exclusion of CEF from the school-bulletin-board forum is reasonable, because it is "wholly consistent with [the school district's] legitimate interest in preserving the property for the use to which it is lawfully dedicated." *Perry,* 460 U.S. at 50–51, 103 S.Ct. 948 (internal citations omitted). By limiting the bulletin boards as specified, the school district can effectively (1) convey important health and safety information to parents and faculty, (2) facilitate communication between the STEA and the faculty on professional matters; and (3) facilitate communication between the parents and faculty on PTA matters.

could not exclude the Good News Clubs solely because their activities were "the equivalent of religious instruction itself." 533 U.S. at 108–12, 121 S.Ct. 2093 ("We disagree that something that is 'quintessentially religious' or 'decidedly religious in nature' cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint.").

We have no reason to believe that CEF would fare any better with respect to the parallel free speech claims under the New Jersey Constitution.[16] N.J. Const. art. 1, ¶ 6. Thus, CEF has not demonstrated a substantial likelihood of success on the merits as to the Federal and State Constitutional Free Speech claims relating to the school-bulletin-board forum.

### 4. Strict Scrutiny for Viewpoint Discriminatory Restrictions and the Establishment Clause

The school district argues that even if CEF's exclusion from the distribution, school wall, and Back–to–School–Night fora was the result of viewpoint discrimination, such action was compelled by the Establishment Clause. We disagree.

■ The government may engage in viewpoint discrimination only if it can show that its restriction is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, 269–70, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). We need not determine whether the school district's interest in complying with the Establishment Clause is sufficiently compelling to justify viewpoint discrimination, because we conclude, at this preliminary stage, that the school district would not likely violate the Establishment Clause by granting CEF's requests.

■ To determine whether a particular state action violates the Establishment Clause, we ask whether "a reasonable, informed observer, i.e., one familiar with the history and context of private individuals' access to the public money or property at issue, [would] perceive the challenged government action as endorsing religion." *Tenafly Eruv Ass'n, Inc. v. Bor. of Tenafly*, 309 F.3d 144, 174 (3d Cir.2002) (citing *Milford*, 533 U.S. at 117–19, 121 S.Ct. 2093).[17] Where the government acts neu-

---

**16.** CEF cites *Green Party v. Hartz Mountain Indus., Inc.* for the proposition that the New Jersey free speech constitutional provision is "broader than practically all others in the nation." 164 N.J. 127, 145, 752 A.2d 315 (2000). That case, however, dealt with restrictions on speech in a traditional public forum. It did not address the situation where, as here, a public school limits access to a forum for reasons that are not viewpoint discriminatory. CEF cites no New Jersey precedent prohibiting such government restrictions, and we have found none.

**17.** Until the past decade, the predominant test for determining violations of the Establishment Clause was the three part test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under that test, the challenged government action does not run afoul of the Establishment Clause if it (1) "has a secular purpose," (2) "does not have the principal or primary effect of advancing or inhibiting religion," and (3) "does not foster an excessive entanglement with religion." *Lamb's Chapel*, 508 U.S. at 395, 113 S.Ct. 2141. In *Tenafly Eruv*, the Third Circuit, noting that recent Supreme Court decisions have not applied the *Lemon* test, adopted the endorsement test developed by Justice O'Connor. *Lynch v. Donnelly*, 465 U.S. 668, 692–94, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J. concurring); *Tenafly Eruv*, 309 F.3d at 174. That test "dispenses with the 'entanglement' prong of the *Lemon* test and collapses its 'purpose' and 'effect' prongs into [the] single inquiry" provided in the text of this opinion preceding this footnote. *Id.* at 174. The *Tenafly Eruv* court noted in a footnote, however, that entanglement remains relevant "in the context of direct aid to public schools ... and in the rare case where government delegates civic power to a religious group." *Id.* at 175 n. 36. Here, direct aid is not at issue. Moreover, even if it could be argued that the school district would be granting civic power to CEF by providing access to the forum, this grant would not result in excessive entanglement. *See Mergens*, 496 U.S. at 252–53, 110 S.Ct. 2356 (holding school would not violate entanglement prong by recognizing religious student group; student-group recognition included, *inter alia*, faculty monitors at meetings and access to school public address system, newspaper, and bulletin boards); *Widmar*, 454

trally, a reasonable, informed observer would not view it as establishing religion. *Id.* at 174 (citing *Milford*, 533 U.S. at 117–19, 121 S.Ct. 2093).

The United States Supreme Court held in *Milford* that a public elementary school would not violate the Establishment Clause by allowing a religious group to use facilities after school hours. 533 U.S. at 113–14, 121 S.Ct. 2093. The Court found unpersuasive the argument that elementary school children would misperceive a state endorsement of religion or feel coercive pressure to participate in religious activities. *Id.* at 113–18, 121 S.Ct. 2093. The Court did not, however, address fora similar to the ones involved here.

The *Mergens* court, however, addressed fora similar to those involved here, albeit in a high school setting. There, the Court held that the school would not violate the Establishment Clause by providing a religious student organization with faculty monitors at meetings and activities, as well as access to the school public address system, newspaper, bulletin boards, and Annual Club Fair. 496 U.S. at 247, 250–252, 110 S.Ct. 2356.[18]

■ The courts are split on the issue of whether a public *elementary* school violates the Establishment Clause by providing a religious organization access to the types of fora addressed here and in *Mergens;* and neither the United States Supreme Court nor the Third Circuit has addressed this question. *Compare Sherman v. Comm. Consol. Sch. Dist. 21*, 8 F.3d 1160, 1165–66 (7th Cir.1993) (distribution of religious flyers to fifth graders and hanging of religious posters on school grounds did not violate Establishment Clause), *and Daugherty v. Vanguard Charter Sch.*, 116 F.Supp.2d 897, 911 (same regarding distribution only), *with Culbertson v. Oakridge Sch. Dist. No. 76*, 258 F.3d 1061, 1065 (9th Cir.2001) (holding, with little discussion, that distribution of religious materials to elementary school children violates Establishment Clause), *and Rusk v. Crestview Local Schs.*, 220 F.Supp.2d 854 (N.D.Ohio 2002) (same).[19] Because we find that the *Milford* reasoning is equally persuasive in the context of the fora at issue here, we resolve this issue in favor of CEF at this preliminary injunctive stage.

U.S. at 276 n. 11, 102 S.Ct. 269 (holding university would risk greater entanglement by enforcing exclusion of religious speech; school would have to define religion and monitor approved groups to ensure compliance).

18. Although *Mergens* did not address distribution of materials to students immediately prior to dismissal or participation in Back–to–School Nights, we find that these fora should be treated no differently than the others. Like the public address system, the student newspaper, and the flyers posted on walls and bulletin boards, distributed materials reach the students while they are at school, but not during instructional time. *See* note 11 *supra.* Moreover, we are not convinced that either students or the public will perceive endorsement from teachers handing CEF materials to students; in *Mergens*, the faculty was similar-

ly involved by monitoring organization meetings and activities. *Id.* at 252, 110 S.Ct. 2356. Back–to–School Night is even less of a concern, as it occurs after school hours and students are not expected to and do not typically attend, unless accompanied by their parents.

19. The school district relies heavily on the Seventh Circuit's decision in *Berger*, which held that a public school violated the Establishment Clause by permitting a religious group to address fifth graders during instructional time, distribute bibles, and encourage the pupils to read them. 982 F.2d at 1164–65. The Seventh Circuit, however, later distinguished that case in *Sherman*, where, like here, the religious organization whose materials were distributed and posted "never [had] the students' undivided attention to promote its religious message." 8 F.3d at 1166.

First, like the school in *Milford*, in our view this school district's inclusion of CEF would "ensure neutrality" toward religion, "not threaten it." 533 U.S. at 114, 121 S.Ct. 2093. Therefore, the school district "faces an uphill battle in arguing that the Establishment Clause compels it to exclude [CEF]." *Id.*

Second, "to the extent we consider whether the community would feel coercive pressure to engage in the Club's activities, the relevant community would be the parents, not the elementary school children." *Id.* at 115, 121 S.Ct. 2093. Unlike *Milford*, religious materials would be handed to the children and posted on the walls during school hours. Like *Milford*, however, "[i]t is the parents who choose whether their children will attend" CEF programs and events. *Id.* (*See* Temp. Restraint Mem. at 7–8.) "Because the children cannot attend without their parents' permission, they cannot be coerced into engaging in the Good News Club meetings." *Id.* at 115, 121 S.Ct. 2093.

Third, the *Milford* court held that the Establishment Clause does not "foreclose private religious conduct during non-school hours merely because it takes place on school premises where elementary school children may be present." *Id.* at 115, 121 S.Ct. 2093. Although distribution of materials occurs and flyers remain hung during school hours, as we stated previously, the messages of these fora are not incorporated into the instructional component of the school day. *See* note 11 *supra; see also Sherman*, 8 F.3d at 1166 (holding no endorsement, in part because information in flyers and posters not discussed in classroom, not incorporated into curriculum, and not "made part of the day's learning activities").

Fourth, we are not convinced that the facts of this case support the conclusion that the Ocean and McKinley pupils would misperceive endorsement. *Id.* at 117, 121 S.Ct. 2093. In *Milford*, the Court stated that there was "no evidence that young children [were] permitted to loiter outside classrooms after the schoolday (sic) has ended" to witness the presence and activities of the Clubs. *Id.* Unlike *Milford*, the students here will receive distributed materials and will likely view the flyers posted on the walls. However, the *Milford* court noted that "even young children are aware of events for which their parents must sign permission forms." *Id.* at 117–18, 121 S.Ct. 2093. Thus, it is unlikely that the availability of promotional materials during non-instructional time would create any additional awareness or perceived endorsement. Moreover, it is not clear that children will understand the school district's accommodation of CEF to be an endorsement of religion rather than an expression of neutrality.

"Finally, ... we cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum." *Milford*, 533 U.S. at 118, 121 S.Ct. 2093. This reasoning applies equally here as in *Milford*. The possibility of perceived hostility is particularly problematic, where, as here, CEF's countervailing Free Speech rights are at risk. *Id.* at 119, 121 S.Ct. 2093. Moreover, Ocean and McKinley pupils are not the only individuals to be aware of the exclusion. *Id.* "We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive." *Id.*

We therefore reach the preliminary conclusion that the school district's Establishment Clause concern is without merit. Because the school district offers no other

compelling interest for excluding CEF's religious speech, we conclude that CEF is likely to succeed on the merits of the claim that the school district's policy violates CEF's rights under the Free Speech Clause of the First Amendment with respect to the distribution, school-wall, and Back–to–School–Night fora.

### B. *Free Exercise Clause*

■ CEF also argues that the school district's restrictions with regard to the school-bulletin-board forum violate the Free Exercise Clause.[20] We disagree.

■ The government, in accordance with the Free Exercise Clause, must neither "discriminate against religiously motivated conduct," nor "proscribe particular conduct only or primarily when religiously motivated," unless it can show that its restriction is "narrowly tailored to advance a compelling government interest." *Tenafly Eruv*, 309 F.3d at 165. If a restriction is " 'neutral' and 'generally applicable,' and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection." *Id.* at 165 (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)).

The school district's restriction is neutral and generally applicable, because it limits access to the bulletin-board forum to particular speakers and subject matters. *See Discussion* Part II.A.3.d *supra*. These limitations are based upon legitimate pedagogical, professional, or safety concerns, not religious criteria. *Id.*

We have no reason to believe, and CEF has presented no argument, that CEF would fare any better with respect to the parallel Free Exercise claims under the New Jersey Constitution. N.J. Const. art. 1, ¶ 3. Thus, CEF has not demonstrated a substantial likelihood of success on the merits of its Federal and State Constitutional Free Exercise claims relating to the bulletin-board forum.

### C. *Equal Protection Clause*

■ This Court also concludes preliminarily that CEF's Equal Protection Clause claims with regard to the school-bulletin-board forum are similarly without merit.[21] Under the Equal Protection Clause of the Fourteenth Amendment, a State entity may "treat different classes of persons in different ways," provided its classification is "reasonable, not arbitrary, and. . . . rests upon some ground of difference having a fair and substantial relation to [its] object . . ., so that all persons similarly circumstanced shall be treated alike." *Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). We find, as a preliminary matter, that the school district's restriction on the use of the bulletin board is reasonable in light of the purposes of (1) conveying important health and safety information to parents and faculty, (2) facilitating communication between the STEA and the faculty on professional matters; and (3) facilitating communication between the parents and faculty on PTA matters. *See Discussion* Part II.A.3.d *supra*. Moreover, CEF is not similarly situated to any of the entities permitted to post materials on the bulletin boards. *See id.*

---

**20.** CEF makes the same argument with regard to the distribution, school-wall, and Back–to–School–Night fora. We need not address these contentions, because we have already determined that the restrictions in these fora are likely unconstitutional under the Free Speech Clause.

**21.** Like the Free Exercise claims, we need not address the Equal Protection claims with regard to the distribution, school-wall, and Back–to–School–Night fora, because we have already concluded that the restrictions in these fora are unconstitutional under the Free Speech Clause.

## D. *Vagueness*

CEF argues that, in addition to being unconstitutional as applied, the school district's distribution policy is unconstitutional on its face. (Temp. Restraint Mem. at 24–26.) Specifically, CEF contends that the written policy is impermissibly vague and overbroad.[22] We conclude that a reasonable probability exists that the challenged portions of the written policy are void for vagueness and, therefore, need not determine whether they are also unconstitutionally overbroad.

■■■ The vagueness doctrine provides that a restriction is void if it either (1) fails to give fair warning as to the prohibited conduct, or (2) allows for arbitrary and discriminatory enforcement because of the absence of adequate standards. *See City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Such a vague regulation may encourage individuals to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (internal citations omitted).

■■■ The written policy at issue provides that distributed material "should relate to school matters or pupil-related community activities." (Pls.' Certif. of Exs.,

Ex. A.) It then specifies a list of groups permitted to distribute flyers and provides that other groups may be added at the discretion of the superintendent. (*Id.*) We agree with CEF that the meaning of "school matters or pupil-related community activities" is ambiguous. (*Id.*) *See Gregoire,* 907 F.2d at 1374–75 (holding terms "educational mission of the school" and "civic" impermissibly vague). Thus, the superintendent has "virtually unlimited discretion in deciding which groups qualify and which do not." *Id.* Accordingly, we conclude that there is a substantial likelihood that the school district's written distribution policy is unconstitutional on its face.

## V. *Irreparable Injury*

■■■ CEF has established the existence of irreparable injury supporting the entry of injunctive relief for access to the distribution, school-wall, and Back to School–Night fora. Generally, a party seeking a preliminary injunction must make "a clear showing of immediate irreparable injury." *Hohe v. Casey,* 868 F.2d 69, 72 (3d Cir.1989). The deprivation of liberties protected by the First Amendment, however, typically constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). "A plaintiff who meets the first prong of the test for a preliminary injunc-

---

**22.** Generally, facial challenges are difficult to sustain, because the party challenging the law must show the absence of any circumstances under which the law in question would be valid. *See, e.g., West v. Derby Unified Sch. Dist. No. 260,* 206 F.3d 1358, 1367 (10th Cir.2000) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Ordinarily, a person to whom a certain law may be constitutional as applied cannot complain that such a law is unconstitutional because of possible circumstances in which its application would in fact be unconstitutional. *See, e.g., id.* at 1367 (quoting

*Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

The related doctrines of overbreadth and vagueness, however, are exceptions to this general rule against facial challenges. *See, e.g., id.* (citation omitted). These doctrines ensure that, due to the vital importance of the First Amendment's protection of freedom of speech, the state's power to regulate speech "must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." *Cantwell v. Connecticut,* 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

tion will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights." *ACLU v. Reno,* 217 F.3d at 172 (citation omitted).

The school district primarily argues that CEF will not suffer irreparable harm, because success on the merits is unlikely. (Defs.' Opp. at 25–26.) As we have already found that CEF is likely to succeed on the merits of the claims with regard to the aforementioned fora, this argument is moot. The school district also contends that other avenues of communication are available to CEF while the present litigation is pending. (*Id.* at 26–27.) However, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. ACLU,* 521 U.S. 844, 889, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Finally, the school district cites *Hohe v. Casey* for the proposition that the "incidental inhibition" of First Amendment rights do not constitute irreparable injury. 868 F.2d at 72 (union's withholding of fees only incidentally affected plaintiffs' ability to freely engage in social and political expression). The school district's restriction, however, denies CEF access to the fora, thereby directly infringing upon CEF's First Amendment rights. Thus, we hold that CEF will suffer irreparable harm if injunctive relief is denied as to the distribution, school-wall, and Back–to–School–Night fora.

## VI. *Balance of the Hardships*

In general, a court should consider the possibility of harm to the nonmoving party from the grant of injunctive relief. *Oburn*

*v. Shapp,* 521 F.2d at 152; *Del. River Port Auth. v. Transam. Trailer Transp., Inc.,* 501 F.2d 917, 924 (3d Cir.1974) ("when considerable injury will result from either the grant or denial of a preliminary injunction, these factors to some extent cancel each other"). The Court must also consider the hardship to any interested third parties. *See, e.g., Oburn,* 521 F.2d at 152.

The school district argues that a grant of injunctive relief will result in a loss of public trust in the school system. (Defs.' Opp. at 28.) In our view, the danger that the public will perceive hostility toward religion by the school district's denial of access is at least as great as any potential public mistrust that would result from perceived endorsement of religion. *See Milford,* 533 U.S. at 118–19, 121 S.Ct. 2093. Therefore, we conclude that the balance of the hardships favors injunctive relief as to the distribution, school-wall, and Back–to–School–Night fora.[23]

## VII. *The Public Interest*

The school district contends that the public interest favors denying injunctive relief, because schools, "[i]n carrying out [their] role as in loco parentis ... must protect [pupils] from certain types of expression." (Defs.' Opp. at 29.) However, neither the government nor the public itself can claim an interest in enforcing an unconstitutional law. *See, e.g., ACLU v. Reno,* 217 F.3d at 180–81. Moreover, the public interest generally favors constitutional protection even in the face of otherwise important interests as the protection of minors. *Id.* at 180–81. Accordingly, we find that the public interest favors injunc-

---

**23.** The school district also contends that granting relief here will open the floodgates to similar claims by other organizations. Because the claims of other organizations are not before us, we will not address them. We note, however, that CEF itself recognizes that the school district may further limit its fora, as to all affected groups including CEF, if it chooses to do so.

tive relief as to the distribution, school-wall, and Back–to–School–Night fora.

### CONCLUSION

This Court concludes that CEF is not substantially likely to succeed on its claims that the school district's denial of access to the school-bulletin-board forum violates the Free Speech or Free Exercise Clauses of the First Amendment or the Equal Protection Clause of the Fourteenth Amendment. However, we do conclude that CEF is likely to succeed on its claims that (1) the school district's exclusion of CEF from the distribution, school-wall, and Back–to–School–Night fora is unconstitutional under the Free Speech Clause of the First Amendment, and (2) the school district's distribution policy is void for vagueness. We further conclude that CEF meets the other three criteria for injunctive relief with regard to these three fora. Accordingly, we will grant CEF's request for injunctive relief, insofar as it relates to the distribution, school-wall, and Back–to–School–Night fora. No bond requirement will be imposed pursuant to Federal Rule of Civil Procedure 65(c), because we find that this case falls within that exceptional class of cases warranting relief from the bond requirement. *See, e.g., First Puerto Rican Festival v. Vineland,* 108 F.Supp.2d 392, 396 (D.N.J.1998); *Palmyra Bd. of Educ. v. F.C.,* 2 F.Supp.2d 637, 643–45 (D.N.J.1998).