

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-15-2004

# Child Evangelism v. Stafford Twp Sch

Precedential or Non-Precedential: Precedential

Docket No. 03-1101

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Child Evangelism v. Stafford Twp Sch" (2004). *2004 Decisions.* Paper 168.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/168

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-1101

_____

CHILD EVANGELISM FELLOWSHIP
OF NEW JERSEY INC., A New Jersey
Not-For-Profit Corporation; CHILD
EVANGELISM FELLOWSHIP OF
NEW JERSEY, INC. BAYSHORE
CHAPTER, A New Jersey
Unincorporated Association

v.

STAFFORD TOWNSHIP SCHOOL
DISTRICT; RONALD L. MEINDERS,
In His Official Capacity as
Superintendent of Stafford
Township School District; ELLEN
BERNSTEIN; BRIAN DELANEY;
*THOMAS DELLANE; LISA
DEVANEY; RAYMOND FIX; DENISE
HARRINGTON;
SCOTT MOSES; WILLIAM POWER;
CAROL WILLIAMS, in their official
capacities as members of the Board of
Education for Stafford
Township School District,
Appellants
*(Amended in accordance with Clerk's
Order dated 2/3/03)

_____

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

(Dist. Court No. 02-cv-04549)
District Court Judge: Mary Little Cooper

_____

Argued: September 11, 2003

Before: ALITO, BARRY, and AMBRO,
Circuit Judges.

(Opinion Filed: October 15, 2004)

Arthur G. Stein (argued)
Stein, Supsie & Hoffman
1041 West Lacey Road
P.O. Box 1070
Forked River, NJ 08731
Attorney for Appellant

Alex J. Luchenitser
Americans United for the Separation
 of Church & State
518 C Street N.E.
Washington, DC 20002
Attorney for Amicus Appellants,
Americans United for Separation
 of Church and State,
The Anti-Defamation League,
People for the American Way,
New Jersey Education Association,
Stafford Township Education Association

Nathan A. Adams, IV (argued)
Kimberlee W. Colby
Christian Legal Society Center for
 Law & Religious Freedom
4208 Evergreen Lane
Suite 222
Annandale, VA 22003
Attorney for Appellee

Eric W. Treene (argued)
Angela M. Miller

United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Attorney for Amicus-Appellee,
 United States

Francis J. Manion
American Center for Law and Justice
6375 New Hope Road
New Hope, KY 40052
Attorney for Amicus-Appellee,
Joseph J. Hills

Douglas Laycock
University of Texas at Austin
 School of Law
727 East 26th Street
Austin, TX 78705
Attorney for Amicus-Appellees,
National Association of Evangelicals
Clifton Kirkpatrick, As Stated Clerk
 of the Presbyterian Church (U.S.A.)
Union of Orthodox Jewish Congregations
 of America
Pat Afalese
Cathy Capozzi
Gretchen Davis
B. Keith Drayton
Kimberly Freewsick
Keith Ruff
Lori Ruff

Julie Underwood
National School Boards Association
1680 Duke Street
Alexandria, VA 22314
Attorney for Amicus-Appellee,
National School Boards Association

OPINION OF THE COURT

ALITO, Circuit Judge:

In this appeal, Stafford Township School District ("Stafford") and Stafford officials (collectively "Stafford") contest a preliminary injunction granted by the United States District Court for the District of New Jersey in favor of Child Evangelism Fellowship of New Jersey, Inc. and Child Evangelism of New Jersey, Inc.—Bayshore Chapter (collectively "Child Evangelism"). Finding that Child Evangelism was likely to succeed in showing that Stafford was engaging in viewpoint discrimination and that this discrimination was not required by the Establishment Clause, the District Court ordered Stafford to treat Child Evangelism like other community organizations with respect to the distribution and posting of materials and participation in so-called "Back-to-School nights." We affirm.

I.

A.

Stafford operates four schools, including Ocean Acres Elementary School ("Ocean Acres") and McKinley Avenue Elementary School ("McKinley"). Ocean Acres instructs students in grades pre-Kindergarten through second, and McKinley instructs students in the third and fourth grades. JA 304.[1] Stafford has

_____

[1] "JA" denotes the Joint Appendix.

2

adopted written policies on the use of its facilities by community groups[2] and the distribution of community group materials to students.[3] In addition, Stafford has developed practices concerning the placement of flyers on school walls and the distribution of flyers and the staffing of tables at Back-to-School nights.

*Distribution of community group materials.* Stafford proclaims that it has an overall policy of assisting community groups. Its written policy on the use of its facilities states that the schools should be used "to the fullest extent possible by community groups and agencies." JA 624. Similarly, its written policy on the distribution of community group literature expresses a "commitment to assist *all* organizations in our rapidly growing community." JA 190 (emphasis added). This policy sets out the following standards regarding materials that may be handed out to students:

> Material being sent home with pupils should relate to school matters or pupil-related community activities. Except when it pertains to the individual pupil, all such material must be approved in advance by the superintendent/designee.

Pupils shall not be used to distribute partisan materials or partisan information pertaining to a school or general election, budget or bond issues, or negotiations. Pupils shall not be exploited for the benefit of any individual, group, or profit-making organization.

No staff member may distribute any materials on school property without prior approval of the superintendent.

All surveys, questionnaires or other similar items requiring pupil or parent/guardian response shall be reviewed and approved by the superintendent prior to distribution.

JA 189.

To implement these standards, Stafford has adopted the following specific rules:

> 1. The principal is authorized to duplicate scheduled memos and send them home with the children. All school activities may be advertised on these memos.

> 2. The following non-profit organizations are permitted to distribute

---

[2]See "Use of School Facilities." JA 624-34.

[3]See "Distribution of Materials by Pupils and Staff Policy." JA 189.

3

information to go home with the children:

a. PTA

b. Stafford Athletic Association

c. Boy Scouts/Girl Scouts

d. Four-H Club

e. Southern Regional High School

f. Lions Club

g. Civil Defense

h. Stafford Township Fire Department

i. Elks

j. Other groups will be added at discretion of the superintendent.

3. None of the aforementioned organizations may solicit money through the children for any activity. The board permits them to advertise their fund raising activity, however, the principal has no authority to collect money for the associations. Flyers must be prepared by the organization and packaged in 35's then given to the school secretaries who will distribute to the target group.

4. All activities must be directly associated with the children who are enrolled in the Stafford Township School District.

5. Exceptions: The PTA may collect membership fees and class sponsor moneys through the office of the principal.

6. All other associations must receive special approval from the board of education.

JA 190-91.

The Stafford policy thus addresses both the groups whose materials may be distributed and the types of materials that are allowed. As for the groups, ten named organizations are specifically approved, and the superintendent is given the "discretion" to add other non-profit groups.[4] Although Stafford has not kept a comprehensive record of the groups whose materials have been sent home at Ocean Acres and McKinley, these groups include the Cub Scouts, Ocean County Girl Scouts, Long Beach Island Foundation of the Arts and Sciences, Southern Ocean County Hospital, Stafford Wrestling Club, College Funding 101, Stafford Basketball Association, Municipal Alliance, Ocean

---

[4]No explanation for the selection of the ten named groups is provided, and no criteria to guide the exercise of the superintendent's discretion are revealed.

4

County Library, Stafford Township Volunteer Fire Company # 1, Stafford Basketball Club, Pop Warner football, and the PTA. JA 119, 199, 210(c).

As for the contents of the materials, it appears that five requirements must be met. First, materials other than those pertaining to a particular student must be approved in advance by the superintendent or (perhaps) by a designee.[5] Second, there must be a nexus between the content of the materials and the students or school. It is said that "[m]aterial being sent home with pupils should relate to school matters or pupil-related community activities" and that "[a]ll activities must be *directly* associated with the children who are enrolled in the Stafford Township School District." (emphasis added). Third, materials are prohibited if they are "partisan" or if they relate to an election or "negotiations" (presumably Stafford's negotiations with its teachers or other employees). Fourth, it is said that pupils are not to be "exploited for the benefit of any individual, group, or profit-making organization." Fifth, with the exception of PTA materials, documents sent home may not solicit money but may advertise fund-raising activities.

The process of distribution works as follows. Community organizations produce flyers or other information at their own expense and place these materials in faculty mailboxes, and the teachers then distribute these materials to the students, usually at the close of the school day just prior to dismissal. JA 200.[6] Except when a flyer "deals with a current curriculum, health or safety issue," it appears that the materials sent home are not discussed in class. Id. As the District Court noted, "[a]lthough [the] distribution of materials occurs and flyers remain hung during school hours . . . the messages of these fora are not incorporated into the instructional component of the school day." Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist., 233 F. Supp. 2d 647, 664 (D.N.J. 2002).

*Back-to-School Nights*. Each fall, Ocean Acres and McKinley hold Back-to-School nights. These events are intended for the benefit of parents, but occasionally a child accompanies a parent or other adult attendee. JA 194-95. Stafford has no formal policy governing the materials that may be displayed at these events or the groups that are allowed to staff "information tables," but Stafford asserts

---

[5]The document entitled "Distribution of Materials by Pupils and Staff" first states that approval may be given by "the superintendent/designee," but three sentences later the document says that "[n]o staff member may distribute any materials on school property without prior approval of the superintendent." JA 189.

[6]Stafford describes the process in this manner: "Generally, the process involves the task of receiving the bundles, placing them in the mailboxes, having them removed from the mailboxes by the teachers, carrying the bundles to their respective rooms and actually distributing the flyers to the children." Id.

5

that it uses the same procedures employed with respect to the distribution of materials. JA 203. When requests are made for use of the tables, the Superintendent gives priority to the largest organizations, those that are viewed as having the greatest impact on the curriculum, and those that emphasize learning and safety and health issues. Id. Stafford does not claim that any group other than Child Evangelism was ever denied the opportunity to display its literature or staff a table based on the content of the material or the nature of the group, but on one occasion, the Boy Scouts' request for a table was denied because of space limitations. Id.

Stafford does not maintain a comprehensive list of the groups that have previously requested or have been permitted to participate in Back-to-School nights, but groups whose materials have been distributed include the Ocean County Library System, the PTA, the Municipal Alliance/D.A.R.E., STEA, Boy Scouts, and Stafford Township Recreation. Id. at 202. The organizations whose materials have been distributed at the Back-to-School nights may have staffed tables at those events "at one time or another." Id. At the Ocean Acres Back to School night in September 2002, Stafford also allowed various community groups, including the Rotary Club and the American Cancer Society, to staff and promote "Extreme Event," a sporting event involving bikers, in-line skaters, and skateboarders. JA 237.

*Posting materials on school walls*. Although Stafford does not have a written policy governing the posting of community group flyers on school walls, Stafford has allowed a variety of groups to post material on the walls of Ocean Acres and McKinley. These groups include the Rotary Club, Ocean County First Night Activities, the PTA, the New Jersey School Boards Association, the Children's Hospital of Philadelphia, the American Society for the Prevention of Cruelty to Animals, the United States Marine Corps' Toys for Tots Drive, and local theater groups. JA 205-06. Stafford has not argued that its policy or practice with respect to the posting of flyers on the walls of the schools is any more restrictive than its policy regarding the distribution of materials. As the District Court wrote: "[T]he school district does not distinguish the criteria for access to the school-wall forum from the distribution and Back-to-School Night fora . . . . Nor does the school district indicate that groups promoting character building and moral and social development, such as the Girl Scouts and Boy Scouts, would be excluded." Child Evangelism of N.J., 233 F. Supp. 2d at 661.

B.

Child Evangelism describes itself as a "Bible-centered, worldwide organization composed of born-again believers whose purpose is to evangelize boys and girls with the Gospel of the Lord Jesus Christ and to establish (disciple) them in the Word of God and in a local church for Christian living." JA 402. Child Evangelism sponsors Good News Clubs, which host weekly meetings for school-

6

age children during after-school hours. The stated objectives of the Good News Clubs include instilling or cultivating "self-esteem, character, and morals in children," providing children with a "positive recreational experience," providing a community where "children feel loved, respected, and encouraged," teaching children "life skills and healthy lifestyle choices," teaching children to "encourage and lead other children" to the same sorts of choices, improving "memory skills, grades, attitudes, and behavior at home," improving relations among the races, instructing children to "overcome feelings of jealousy" and to treat others as they want to be treated themselves, teaching children to be "obedient and to respect persons in authority," and instructing children to "follow the numerous other moral and other teachings of Jesus Christ." JA 374. A Good News Club flyer states: "Good News Clubs are groups meeting one hour per week designated to serve boys and girls through Bible-Oriented and character building learning and moral object lessons, as well as recreational activities like singing and Bible review games." JA 216.

Another Child Evangelism flyer describing the Good News Club states:

> You're Invited to Good News Club!
>
> Purpose of the Club: Regular weekly meetings will provide various fun-filled activities to help young people make smart

choices that will effect [sic] the rest of their lives. Using the Bible as the main textbook, you will learn how to apply the stories and biblical principles to your life.

> Club Activities include a snack, singing, learning Bible verses, listening to a Bible lesson and playing learning games.
>
> . . . .
>
> Have a fun time as you learn from God's Word . . . .

JA at 212-13.

Students cannot attend a meeting of the Good News Club without the consent of a parent or a guardian. See JA 376. When a student first attends a meeting, the student must bring a written permission slip. See JA 212. In addition, Child Evangelism's flyers clearly state that the group is not school-sponsored. See JA 215 (Child Evangelism Flyer stating: "This is not a school-sponsored activity.").

### C.

The events that led to the filing of this action began in early 2002. Child Evangelism submitted an official Stafford form, "Application for Use of Building," seeking permission to use a classroom at McKinley for weekly one-hour after-school Good News Club meetings. JA 630. This form was signed as approved by the principal on March 8, 2002, and by the

superintendent on March 11, 2002. Child Evangelism also asked to have its flyers and permission slips distributed to pupils at McKinley, but according to Child Evangelism, the superintendent orally rejected this request on the advice of counsel "due to Establishment Clause concerns." JA 135.

In May 2002, Child Evangelism contacted the school district again and asked, among other things, that its flyers and permission slips be distributed to pupils and that Child Evangelism representatives be allowed to hand out materials and staff a table at Back-to-School nights. Child Evangelism of N.J., 233 F.Supp. 2d at 652. The school district rejected these requests. In the summer of 2002, Child Evangelism submitted applications to use classrooms at McKinley and Ocean Acres during the upcoming school year, as well as requests to have Good News Club materials distributed to pupils. JA 633-34.

On September 12, 2002, the school district responded but did not provide a final decision on the requests. Because the dates of the Ocean Acres and McKinley Back-to-School nights were approaching, Child Evangelism advised Stafford that it would be forced to commence litigation, and it subsequently filed the present action and sought a temporary restraining order. Child Evangelism's complaint alleged that Stafford was violating its rights to freedom of speech and the free exercise of religion under the federal and state constitutions, as well as its federal constitutional right to equal protection.

Counsel for Stafford subsequently advised Child Evangelism that its request to use the school facilities had been approved, see JA 630, but Child Evangelism's other requests were denied due to "concerns about violating the Establishment Clause, the effect of [Child Evangelism's] requests on the children in the school system's care, the effect of [Child Evangelism's] requests on the relationship between the schools and the parents as well as the effect of opening the schools as limited public fora in the future if the schools . . . compl[ied] with [Child Evangelism's] requests." JA 201. Stafford also believed that distributing Child Evangelism's materials would "tend to create divisiveness between and amongst parents to parents and children to children, as well as the staff." JA 210(e).

The District Court denied the request for temporary restraints but issued an order to show cause why a preliminary injunction should not be issued. After further proceedings, the District Court granted the motion for a preliminary injunction, finding that Child Evangelism was likely to succeed on the merits of its claim under the Free Speech Clause of the First Amendment with respect to the distribution of its materials, the posting of its materials on the school walls, and participation at Back-to-School nights. Child Evangelism, 233 F. Supp. 2d at 648. The District Court concluded that Child Evangelism was asserting the right to speak in several different fora, including what it termed the "distribution," "school wall," and "Back-to-School" fora. Id. at

8

659. The Court concluded that it was likely that these were "limited public fora," but the Court found it unnecessary to decide that question, because viewpoint discrimination is unconstitutional even in a non-public forum. Id.

With respect to the "distribution forum," the District Court held that Child Evangelism had sought "to speak on a topic [that was] otherwise permissible," but had been denied that opportunity because it wished to address the topic "from a religious perspective." Id. at 660. The Court noted that other groups that conducted "children's activities for character building and social development," such as the Girl Scouts, had been permitted to have their literature distributed. Id. The Court reached a similar conclusion with respect to the "Back-to-School night" and "school wall" fora. Id. at 661.[7]

The Court then concluded that Stafford was likely to fail in its argument that discrimination against Child Evangelism was necessary in order to comply with the Establishment Clause. Id. 662. The Court further held that, although Child Evangelism's free exercise and

---

[7]The Court held that Child Evangelism was not likely to prevail on its claim that Stafford had engaged in viewpoint discrimination in refusing to post Good News materials on certain school bulletin boards. Child Evanelism, 233 F.Supp. 2d at 660. This issue is not before us in this appeal.

equal protection claims were not likely to prevail, there was a substantial possibility that the Stafford policy would be held to be facially unconstitutional on the ground of vagueness. Id. at 665-66. Finding that the irreparable harm that would be suffered by Child Evangelism if a preliminary injunction did not issue outweighed any harm to Stafford, and finding that the public interest would be served by granting the requested relief, the District Court issued a preliminary injunction ordering Stafford to treat Child Evangelism the same as other community groups with regard to the distribution and posting of literature and participation at Back-to-School nights. Stafford then took the present appeal.

II.

We ordinarily use a three-part standard to review a District Court's decision to grant a preliminary injunction. The District Court's findings of fact are reviewed for clear error; the District Court's conclusions of law are evaluated under a plenary review standard; and the ultimate decision to grant the preliminary injunction is reviewed for abuse of discretion. See Warner-Lambert Co. v. Breathasure, Inc., 204 F.3d 87, 89 n.1 (3d Cir. 2000). When First Amendment rights are at issue, however, this standard is modified. Although we normally will not disturb the factual findings supporting the disposition of a preliminary injunction motion in the absence of clear error, we have a constitutional duty to conduct an independent examination of the record as a whole when a case presents a First

Amendment claim. See Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir. 2002).

"The test for preliminary relief is a familiar one. A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." KOS Pharm., Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004). Consequently, "a panel entertaining a preliminary injunction appeal generally decides only whether the district court abused its discretion in ruling on the request for relief and generally does not go into the merits any farther than is necessary to determine whether the moving party established a likelihood of success." The Pitt News v. Pappert, 2004 WL 1689681 at *4 (3d Cir. 2004). However, "a panel is not always required to take this narrow approach. If a preliminary injunction appeal presents a question of law 'and the facts are established or of no controlling relevance,' the panel may decide the merits of the claim." Id. at *4 (emphasis in original omitted); see also Thornburgh v. Am. College of Obstetricians & Gynecologists, 476 U.S. 747, 756-57 (1986); Maldonado v. Houstoun, 157 F.3d 179, 183-84 (3d Cir. 1998).

### III.

We first consider Stafford's contention that the speech at issue in this case – i.e., the materials that Child Evangelism wished to have distributed and posted – represented school-sponsored speech, not private speech, and that Stafford was therefore allowed to control the content of that speech under Hazelwood Sch. Dist. v. Kuhlmeir, 484 U.S. 260 (1988), so long as the regulation served a legitimate pedagogical purpose. Appellant's Br. at 31. This argument falls very far from the mark.

School- or government-sponsored speech occurs when a public school or other government entity aims "to convey its own message." Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 833 (1995). By contrast, when a school or other government body facilitates the expression of "a diversity of views from private speakers," the resulting expression is private. Id. at 834.

Here, Stafford's purpose is not to convey its own message through the distribution and posting of community group materials but to "assist all organizations" in the community. JA 190 (emphasis added). Materials that are handed out are written and paid for by community groups, and Stafford teachers do no more than retrieve the materials from their mailboxes and distribute them to the children, usually at the end of the school day. The teachers do not discuss or express approval of the materials. Stafford's standards for acceptable materials are broad, and a great many community groups have had their flyers distributed.

10

Contrary to Stafford's suggestion, the present case bears little resemblance to cases involving school-sponsored speech. In Hazelwood, a high school newspaper was held to represent school-sponsored speech where: the paper was the official school newspaper; it was printed with school funds and produced by students in a journalism class that was part of the school curriculum; the students' work was reviewed and graded by the teacher; a faculty member closely supervised all aspects of the paper, including the selection of the editors, the number of pages in each edition, the assignment of stories, and the editing of everything that appeared in the paper, including letters to editor; and the entire paper was reviewed by the principal before publication. See Hazelwood, 484 U.S. at 262, 268-69.

Here, by contrast, the Good News Club flyers and permission slips were obviously not official Stafford documents. On the contrary, Stafford had no hand in writing the materials in question and did not pay for them. Nothing in the materials suggested that Stafford had any role in their production or approved of their content. Indeed, the Good News Club flyer contained an express disclaimer stating that the Good News Club was "not a school sponsored activity." JA 215.

Nor do the materials at issue here resemble the pre-game invocation that was held to be school-sponsored speech in Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290 (2000). There, past practice clothed the speech with the mantle of school approval, since the pre-game invocation had previously been delivered by the school's student chaplain. Id. at 309. In addition, the speech was incorporated into an official school-sponsored event (a high school football game) that was staged on school property, and the speech was broadcast on the school's public address system. Id. at 307-08. Moreover, this event was one that played a central part in the social life of the school and that some students (football team and band members) were required to attend. Id. at 311-12. The school also regulated the identity of the speaker. Id. at 303-04. Only one student could speak, and the prescribed method of selecting the speaker – an election – insured that minority views would probably never be expressed. Id. Finally, the school regulated the content of the speech, prescribing that it had to be an "invocation," a type of address that naturally suggests a prayer, and that it could not be denominational or proselytizing. Id. Not one of these features is present in the case at hand.

While this case is unlike Hazelwood and Santa Fe, it is comparable to cases in which public educational institutions have properly facilitated speech by a broad array of private groups. See, e.g., Good News Club v. Milford Cent. Sch., 533 U.S. 98 (2001) (use of school facilities by community groups); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384 (1993) (same); Rosenberger, 515 U.S. 819 (university program subsidizing broad array of student activities). Like those

11

cases, this case involves private, not school-sponsored, speech.

## IV.

Stafford next contends that, even if the speech at issue here was private, Stafford was permitted to regulate the content of the speech because the three fora identified by the District Court were "closed." We disagree.

First, as the District Court suggested, it is evident that Stafford created limited public fora when it opened up the three fora at issue for speech by a broad array of community groups on matters related to the students and the schools. Stafford had no constitutional obligation to distribute or post *any* community group materials or to allow *any* such groups to staff tables at Back-to-School nights. But when it decided to open up these fora to a specified category of groups (i.e., non-profit, non-partisan community groups) for speech on particular topics (i.e., speech related to the students and the schools), it established a limited public fora. See, e.g., ISKCON v. Lee, 505 U.S. 672, 678 (1992); Widmar v. Vincent, 454 U.S. 263 (1981). As a consequence, it is bound to "respect the lawful boundaries it has itself set." Rosenberger, 515 U.S. at 829. It "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' . . . nor may it discriminate against speech on the basis of its

viewpoint." Id. (citations omitted).[8]

Second, even if the three fora were not limited public fora but were closed, Stafford still could not engage in viewpoint discrimination. As the Supreme Court observed in Lamb's Chapel, 508 U.S. at 392-93 (emphasis added), "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum *and are viewpoint neutral."* See also Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 806, 811 (1985) (the "existence of reasonable grounds for limiting access to a nonpublic forum . . . will not save a regulation that is in reality a facade for viewpoint-based discrimination"); Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth., 148 F.3d 242, 247 (3d Cir. 1998). Therefore, assuming for the sake of argument that the fora at issue in this case were non-public, if Stafford engaged in viewpoint discrimination, it violated Child Evangelism's free-speech rights.

## V.

We thus turn to the central questions in this case – whether Stafford excluded Child Evangelism from the fora at issue pursuant to viewpoint-neutral

---

[8]Stafford's policy that all materials be reviewed and approved in advance does not render the fora non-public. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 554-55 (1976); Widmar v. Vincent, 454 U.S. at 268-69.

criteria that are reasonable in light of the purpose of the fora or whether, as the District Court suggested, Stafford engaged in viewpoint discrimination. The answers to these questions are clear.

A.

We have summarized Stafford's rules regarding access to the distribution forum, and as the District Court noted, it appears that Stafford's criteria for access to the school-wall and Back-to-School night fora were similar. Thus, the relevant requirements seem to be as follows: the group must be non-profit and the speech must: (1) receive prior approval by the district, (2) have a nexus with the students or school, (3) be non-partisan and unrelated to an election or labor negotiations, (4) not seek to "exploit[]" children "for the benefit of any individual, group, or profit-making organization," and (5) not solicit money (except for the PTA). See JA 189-91.

Child Evangelism and its materials satisfy all the viewpoint-neutral requirements set out in this list. Indeed, Stafford's briefs make no direct effort to show that Child Evangelism's materials fail to meet any of these requirements, and any such effort would be fruitless. Child Evangelism is a non-profit group, and (1) it sought advance approval from the superintendent; (2) its materials, which invite students to attend club meetings on school premises after school, relate to the students and the school; (3) the materials are not "partisan" and have nothing to do with elections or negotiations; (4) they do not seek to exploit children for commercial gain; and (5) they do not solicit money.

In its brief, Stafford offers a list of other, purportedly viewpoint-neutral reasons for excluding Child Evangelism. Stafford contends that it excludes: (1) all groups representing "special interests" (Appellants' Br. at 38), (2) all groups that do not restrict themselves to "mundane recreational activities" (id. at 34), (3) all groups whose views are "divisive" or "controversial" (id. at 29-30), (4) all speech that promotes any point of view, whether "religious, commercial or secular" (id. at 21), (5) all groups that proselytize (id. at 28), and (6) all speech about religion (id.). These rationalizations are either incoherent or euphemisms for viewpoint-based religious discrimination.

(1) Every group in a sense represents "special interests," namely, the interests to which the group is dedicated. Even a noncontroversial and beneficent organization like the Stafford PTA represents "special interests" – the interests of the Stafford pupils and schools – and at times even these interests may conflict with those of others in the community. Thus, if this criterion is literally interpreted and applied, it fails to set a meaningful, viewpoint-neutral standard. Of course, the term special interest group is often used to express the view that the group in question is dedicated to ends that conflict with the common good. If Stafford uses the term in this sense, the criterion is not viewpoint-neutral.

13

(2) Stafford's argument that it excludes groups that promote anything other than "mundane recreational activities" is hard to take seriously. If a group of parents organized a youth team in a sport not popular in this country – say, cricket – would Stafford refuse to distribute their flyer on the ground that the activity was not "mundane"? If parents organized a club dedicated to the study of an uncommon foreign language, would Stafford refuse to hand out their materials because the activity was neither "mundane" nor "recreational"? Nothing in the record suggests that Stafford would rebuff such requests.

(3) To exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint. <u>See</u> <u>Cornelius</u>, 473 U.S. at 812 (warning that "the purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers"). Although the ten groups specifically approved by Stafford are apparently not controversial or divisive in that community, at least some would be controversial and divisive elsewhere. Even in the school setting, "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is not enough to justify the suppression of speech.[9] <u>Tinker v. Des</u>

<u>Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 509 (1969).

(4) All community-group speech promotes a point of view. All of the specifically approved groups, including such familiar and well-regarded groups as the PTA and the 4-H Club, have a point of view. Thus, this criterion is devoid of meaning.

(5) To proselytize means both "to recruit members for an institution, team, or group" and "to convert from one religion, belief, opinion, or party to another." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1821 (1976). The record shows that Stafford does not reject groups that proselytize in the sense of recruiting members. Many of the groups specifically approved in the Stafford rules do so, and the record contains numerous flyers – produced by groups from the Cub Scouts to the local wrestling club – that Stafford

[9]Schools may regulate private speech that occurs on school premises during the school day if it "materially and substantially interfere[s] with the requirements of appropriate discipline," but an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 508-09 (1969) (internal quotation marks omitted). For this reason, (a) Stafford cannot simply ban all "controversial" speech but (b) there is no merit to Stafford's contention that if it distributes the literature of the Good News Club, it will have to distribute the literature of virulent racist groups.

14

has distributed and that seek to recruit members. See JA 338, 346-47, 350, 352-57.

What Stafford appears to mean when it says that it excludes groups that proselytize is that it rejects religiously affiliated groups that attempt to recruit new members and persuade them to adopt the group's views. This is viewpoint discrimination.

(6) Finally, Stafford's attempt to justify its actions on the ground that it excludes all speech on "religion as a subject or category of speech" flies in the face of Supreme Court precedent. "[P]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995). Cases such as Lamb's Chapel, Rosenberger, and Good News Club establish that if government permits the discussion of a topic from a secular perspective, it may not shut out speech that discusses the same topic from a religious perspective. In Lamb's Chapel, a school district was held to have violated the right of free speech by permitting "school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint." Lamb's Chapel, 508 U.S. at 393. In Rosenberger, a free speech violation occurred because the university refused to support a student publication called *Wide Awake* "on the ground that the contents of Wide Awake reveal an avowed religious perspective." Rosenberger, 515 U.S. at 832. The Court observed:

> It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought. . . . We conclude, nonetheless, that here, as in *Lamb's Chapel*, viewpoint discrimination is the proper way to interpret the University's objections to Wide Awake.

Id. at 831.

Most recently, in Good News Club v. Milford Cent. Sch., supra, the Supreme Court rejected an argument that was virtually identical to the one that Stafford advances here. The school allowed its facilities to be used for "instruction in any branch of education, learning or the arts" and for "social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community," provided that the events were open to the general public. Good News Club, 533 U.S. at 102. The school refused, however, to permit the use of its facilities by a Good News Club, stating that "'the kinds of activities proposed to be engaged in by the Good News Club were not a discussion of secular subjects such as child rearing, development of character and development of morals from a religious perspective, but were in fact the equivalent of religious instruction itself.'" Id. at 103-

15

04. The Second Circuit sustained this policy, holding that the Good News Club's activities fell "outside the bounds of pure 'moral and character development'" because they were "quintessentially religious." Good News Club v. Milford Cent. Sch., 202 F.3d 502, 510-11 (2000), rev'd 533 U.S. 98 (2001)

Applying Lamb's Chapel and Rosenberger, the Supreme Court reversed and held that the school had engaged in impermissible viewpoint discrimination. The Court pointed out that the Good News Club sought "to address a subject otherwise permitted under [the school's rules], the teaching of morals and character, from a religious standpoint," Lamb's Chapel, 533 U.S. at 109, and the Court rejected the Second Circuit's position that "something that is 'quintessentially religious' or 'decidedly religious in nature' cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint." Id. at 111. The Court elaborated: "What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons." Id. This holding forecloses Stafford's argument that its disparate treatment of Child Evangelism was not viewpoint discrimination.

### B.

Not only did Stafford discriminate against Child Evangelism because it teaches "morals and character, from a religious standpoint," Good News Club, 533 U.S. at 109, but it also appears that Stafford disfavored Child Evangelism because of the particular religious views that Child Evangelism espouses. Several of the groups that Stafford has allowed to distribute and post materials – specifically the Boy Scouts, the Girl Scouts, and the Elks – espouse religious views and require or encourage members to endorse these beliefs.

The Boy Scouts describes itself as "an organization with strong religious tenets." JA 514. The stated mission of the Boy Scouts is to "prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law." JA 516. The well-known Boy Scout Oath begins with the words "On my honor I will do my best / To do my duty to God and my country." JA 517. In describing this portion of the Oath, official Boy Scout literature states: "Our nation is founded on showing reverence to a higher faith. In these words, the Scout promises to recognize, to honor and to respect his religious faith. And in the Boy Scouts of America, he is given an opportunity to grow in that faith and to respect the beliefs of others." Id. And though the Boy Scouts of America is a nonsectarian group, it still "maintains that no child can develop to his or her fullest potential without a spiritual element in his or her life." Id.

The Girl Scout Promise includes a commitment to "serve God." JA 524. The

16

group takes the view that God can be "interpreted in a number of ways" and permits the word "God" in the Promise to be replaced by "whatever word [a girl's] spiritual beliefs dictate." Id. The Benevolent and Protective Order of Elks of the United States of America requires its members to "believe in God." Id. at 528.

In discovery, Stafford propounded an extraordinary set of requests for admissions that sought to elicit Child Evangelism's admission that it adheres to a variety of traditional Christian doctrines. See JA 369. Stafford's brief highlighted these beliefs as grounds for its actions, see Appellant's Br. at 10, and at argument Stafford's counsel stated: "We were concerned that, what the Child Evangelism Fellowship teaches appears to be inconsistent with what we're obligated to teach, that being diversity and tolerance." Oral Arg. Tr. at 10. Suppressing speech on this ground is indisputably viewpoint-based.

## VI.

### A.

Stafford argues that even if it engaged in viewpoint discrimination, its conduct was justified for the purpose of avoiding a violation of the Establishment Clause. Similar arguments were rejected in Lamb's Chapel, 508 U.S. at 394-97, Rosenberger, 515 U.S. at 845-46, and Good News Club, 533 U.S. at 112-120, and Stafford's rendition here is no more convincing.

The Supreme Court has not settled the question whether a concern about a possible Establishment Clause violation can justify viewpoint discrimination. See Good News Club, 533 U.S. at 112-13 ("[While] [w]e have said that a state interest in avoiding an Establishment Clause violation 'may be characterized as compelling,' and therefore may justify content-based discrimination . . . , it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination.") (internal citation omitted) (quoting Widmar v. Vincent, 454 U.S. 263, 271 (1981)). But we need not decide this issue here, because giving Child Evangelism equal access to the fora at issue would not violate the Establishment Clause. The Supreme Court has repeatedly "rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design." Rosenberger, 515 U.S. at 839.

### B.

Contrary to the arguments of Stafford and its amici, equal access would not result in an impermissible endorsement of religion. An unconstitutional endorsement of religion is said to occur when government makes "adherence to a religion relevant in any way to a person's standing in the political community.'" Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 625 (1989) (O'Connor, J., concurring) (quoting Lynch v. Donnelly, 465 U.S. 668, 687 (1984)

17

(O'Connor, J., concurring)). "'Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" Id. "Disapproval of religion conveys the opposite message." Id.

In order to determine whether a challenged practice "'constitutes an endorsement or disapproval of religion,'" the practice must be "'judged in its *unique circumstances.*" Allegheny County, 492 U.S. at 624-25 (O'Connor, J., concurring) (quoting Lynch, 465 U.S. at 694 (O'Connor, J., concurring)) (emphasis in Allegheny). In addition, the challenged practice must be considered from the perspective of a hypothetical reasonable observer who is "aware of the history and context of the community and forum." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment).

The Supreme Court has repeatedly held that granting equal access to facilities in educational institutions does not offend this principle. In Bd. of Educ. of the Westside Cmty. Schs. v. Mergens, 496 U.S. 226, 252 (1990), the Court found that a public school's recognition of a religious student club would not be perceived as endorsement where the school recognized a "broad spectrum" of clubs and allowed its students to "initiate and organize additional student clubs." These features, the Court held, "counteract[ed] any

possible message of official endorsement of or preference for religion or a particular religious belief." Id. Official recognition of the club "carrie[d] with it access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair," id. at 247, fora very similar to those at issue in the present case.

In Lamb's Chapel, the Court ruled that allowing a film with a religious message to be shown on school premises after school hours in a gathering that was sponsored by a private group and open to the public would not have created any "realistic danger that the community would think that the District was endorsing religion or any particular creed." 508 U.S. at 395. And in Good News Club, 533 U.S. at 118, the Court concluded that even small children would not perceive that allowing the Good News Club, like other community groups, to meet on school premises represented an endorsement by the school of the group's beliefs. The Court added: "[E]ven if we were to inquire into the minds of schoolchildren in this case, we cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum." Id.

Applying these precedents, we see no endorsement problem here. Child Evangelism's flyers specifically disclaim any school sponsorship. In addition, a reasonable observer, "aware of the history and context of the community and forum,"

18

<u>Pinette</u>, 515 U.S. at 780, would know that Stafford has a policy of assisting a broad range of community groups, that Stafford plays no role in composing the flyers that are sent home and does not pay for them, and that Stafford teachers do not discuss the flyers in class. If permitting Good News Club meetings on school premises shortly after the end of the school day does not convey a message of endorsement, the lesser activities at issue here cannot be viewed as bearing the school's implicit approval.

Stafford and its amici contend that the relevant reasonable observer in this case is an elementary school child and that such a child is likely to interpret school facilitation of private speech as amounting to an endorsement of the speech. Indeed, they contend that elementary school children are incapable of understanding the difference between school-sponsored extracurricular activities and privately run activities that the school assists in publicizing. However, <u>Good News Club</u> and decisions of other courts of appeals undermine that argument.

In <u>Good News Club</u>, it was argued that young children would interpret the use of the school building for club meetings as signifying that the meetings were endorsed by the school. In response, the Court stated that "even if we were to inquire into the minds of the schoolchildren in this case, we cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if

the Club were excluded from the public forum." <u>Good News Club</u>, 533 U.S. at 118. The Court elaborated:

> We cannot operate . . . under the assumption that any risk that small children would perceive endorsement should counsel in favor of excluding the Club's religious activity. We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive. . . . There are countervailing constitutional concerns related to rights of other individuals in the community. In this case, those countervailing concerns are the free speech rights of the Club and its members.

<u>Id</u>. at 518-19.

Heeding these comments, recent court of appeals decisions have rejected arguments essentially the same as Stafford's here. In <u>Hills v. Scottsdale Unified Sch. Dist.</u>, 329 F.3d 1044 (9th Cir. 2003), a school district had a policy of distributing community-group literature but refused to hand out the brochures for a summer camp that offered classes on

"Bible Heroes" and "Bible Tales." Id. at 1046. Holding that the school district had engaged in viewpoint discrimination and that handing out information about the camp would not have violated the Establishment Clause, the panel rejected the school district's argument that "the impressionability of elementary-age students mandate[d] the exclusion of such material." Id. at 1053. Among other things, the panel noted that the brochures' disclaimer of school sponsorship lessened any danger that distribution would be perceived as endorsement, and the panel thought it of little significance that in some schools the teachers handed the brochures directly to students and that distribution sometimes occurred "at the end of the day" and "thus technically during school hours." Id. at 1054. See also Prince v. Jacoby, 303 F.3d 1074 (9th Cir. 2002) (requiring that a school club be given equal access to, among other things, the yearbook, public address systems, and bulletin boards).

In Rusk v. Crestview Local Sch. Dist., No. 02-3991, 2004 WL 1793283 (6th Cir. Aug. 12, 2004), an elementary school had the practice of placing in students' school mailboxes flyers advertising the activities of many community groups, including flyers advertising religious activities. Holding that this practice did not violate the Establishment Clause, the Sixth Circuit concluded that because the students could not participate in any of the activities without parental approval, "the relevant observers are the parents," id. at 2, not the students and added that "even if the . . .

students were the relevant audience, their youth would not alter the outcome." Id. at 3.

In Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch., 373 F.3d 589 (4th Cir. 2004), the Child Evangelism Fellowship of Maryland applied for a preliminary injunction requiring Montgomery County elementary schools to send home Good News Club flyers just as they sent home the flyers of other non-profit community groups. Id. at 591. Reversing the denial of the application, the Fourth Circuit saw "no meaningful way to distinguish [the] case from controlling precedents." Id. at 602. The district maintained that allowing the Good News Club flyers to be sent home would violate the Establishment Clause in light of "the age of the students," but the Fourth Circuit viewed this argument as inconsistent with Good News Club. Id.

Even before Good News Club was decided, the Seventh Circuit held in Sherman v. Cmty. Consol. Sch. Dist., 8 F.3d 1160 (7th Cir. 1993), that a grade school did not violate the Establishment Clause by distributing Boy Scout literature and allowing Boy Scout posters to be hung on the school walls. The school's policy was challenged by a boy and father whose membership in the group had been revoked because they refused to accept the provision of the Scout Oath requiring a belief in God. Id. at 1162-63. They argued that the school violated the Establishment Clause "by endorsing the religious message" of the Boy Scouts, but the Seventh Circuit disagreed and rejected

20

the plaintiffs' contention "that the age of the children involved tip[ped] the balance in their favor." Id. at 1166.[10]

***

[10]Our decision here and the Fourth, Sixth, and Seventh Circuit decisions discussed above appear to differ from a portion of the Ninth Circuit's decision in Culbertson v. Oakridge School District No. 76, 258 F.3d 1061 (9th Cir. 2001), but we find that portion of Culbertson unpersuasive.

In Culbertson, a Ninth Circuit panel held that an elementary school that opened its doors to after-school use of its facilities by a variety of community youth groups was required to grant similar access to a Good News Club. The panel concluded, however, that the school's distribution of Good News Club permission slips would violate the Establishment Clause. The panel stated: "Not just an empty classroom but a teacher's nod of encouragement is thereby afforded the club's religious program." Id. at 1065.

We find this analysis unconvincing. The Culbertson panel did not explain why the simple act of handing out permission slips – presumably in the same manner as other community-group literature – amounted to "a nod of encouragement", nor did the panel explain why permitting a group to conduct meetings on school premises is less likely to be interpreted as "a nod of encouragement." If anything, the opposite seems likely.

Furthermore, the Ninth Circuit's more recent decision in Hills v. Scottsdale Unified School District, supra, limits

We agree with these decisions and hold that granting Child Evangelism equal access to the fora in question would not have constituted an endorsement of religion. "The proposition that schools do not endorse everything they fail to censor is not complicated," Mergens, 496 U.S. at 250 (plurality), but if Stafford is

***

Culbertson's reach. Holding, as noted above, that a school district with a broad policy of distributing community group literature could not exclude a brochure for a camp with Bible classes, the panel distinguished Culbertson on the following grounds: the camp in Hills did not meet on school grounds; Culbertson held only that the club's permission slips, not its brochures, could not be handed out; and the camp brochure in Hills (apparently unlike the permission slips in Culbertson) contained an express disclaimer of school sponsorship. Hills, 329 F.3d at 1054.

We agree that the presence or absence of a disclaimer of school sponsorship is a meaningful (although not necessarily dispositive) factor, but we see little relevance in the distinction between a brochure for an extracurricular activity and a permission slip for the same activity. We also do not see how Culbertson's holding on the permission slips could have turned on the fact that the club meetings were to be held on school grounds. After all, Culbertson, following Good News Club, held that the school was obligated to allow the club to meet on school grounds.

21

legitimately worried about possible misunderstandings there are obvious steps that it can take. Stafford can send home an announcement to parents setting out its broad-ranging policies and making clear that it does not necessarily endorse all the groups whose materials are distributed or posted. Stafford teachers can explain the point to students.

## C.

Giving Child Evangelism equal access to the fora in question also would not offend the "Lemon test." See Lemon v. Kurtzman, 403 U.S. 602 (1971). Under Lemon, there is no Establishment Clause violation if the challenged law or practice (1) has "a secular purpose," (2) "its principal or primary effect" "neither advances nor inhibits religion," and (3) it does not "foster an excessive government entanglement with religion." Lemon, 403 U.S. at 612-13. In Agostini v. Felton, 521 U.S. 203, 233-34 (1997), the Court clarified the third prong of this test, concluding that it is best understood "as an aspect of the inquiry into a statute's effect." See Tenafly, 309 F.3d at 174 n.36.

The Lemon test is satisfied in this case. First, granting equal access to the three fora has a secular purpose. Stafford's stated goal is to "assist all organizations in our rapidly growing community." JA 190. Stafford appears to take the view that the community and its children are enriched by the opportunity to participate in a variety of privately run activities. By permitting a broad range of community groups to have their flyers distributed and posted in the schools and by allowing these groups to be represented at Back-to-School nights, Stafford helps to inform families about the wide spectrum of activities from which they may choose and to foster the growth of diverse community groups. These are indisputably legitimate secular purposes.

Granting equal access would not have the principal or primary effect of advancing religion. Rather, the principal and primary effect would be to inform school families about available community activities and to foster a wide range of activities in the community. While some religious groups would benefit from equal access, so would a great many secular groups. "The provision of benefits to so broad a spectrum of groups is an important index of secular effect." Widmar, 454 U.S. at 274. "[A] religious organization's enjoyment of merely 'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion." Id. at 273.

Finally, granting equal access to the three fora would not result in unconstitutional entanglement. An entanglement must be "'excessive' before it runs afoul of the Establishment Clause," and this requires more than mere "[i]nteraction between church and state," for some level of interaction has always been "tolerated." Agostini v. Felton, 521 U.S. at 233. As the Supreme Court explained in Agostini, the factors employed "to assess whether an entanglement is 'excessive' are similar to the factors . . . use[d] to examine 'effect.'"

22

Id. at 232. Thus, we must look to "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." Id. (quoting Lemon, 403 U.S. at 615.)

Here, granting equal access would not result in excessive entanglement. As we have explained, the principal and primary effects of granting equal access would be secular, and allowing equal access would produce little additional interaction between Child Evangelism and Stafford. Child Evangelism would simply send its flyers and permission slips to the schools and, space permitting, send a representative to Back-to-School nights. Stafford in turn would merely perform the largely ministerial tasks needed to distribute and post the materials and (again, space permitting) accommodate a Child Evangelism representative at Back-to-School nights. If there is no excessive entanglement when a public school allows a Good News Club to meet on school premises during after-school hours, see Good News Club, 533 U.S. 98, there certainly would be no excessive entanglement here.

D.

Nor would granting equal access "coerce anyone to support or participate in religion or its exercise." Lee v. Weisman, 505 U.S. 577, 587 (1992). In Lee, the Court held that a school engaged in improper coercion by including an invocation led by a member of a clergy as part of a commencement program. The Court reasoned that the importance of commencement in a student's life puts pressure on students to attend, that those attending would feel social pressure to stand in silence during the invocation, and that this act would be viewed by some objectors as amounting to participation in or approval of the prayer. See id. at 586, 593, 595-96.

In Santa Fe Indep. Sch. Dist. v. Doe, supra, the Court held that an invocation held before a high school football game likewise exerted improper pressure on students to participate in a religious ceremony to which they objected. The Court noted that some students (team and band members and cheerleaders) were required to attend and that others felt peer or social pressure to do so. Santa Fe, 530 U.S. at 311-12.

The distribution and posting of Good News Club flyers and posters and the presence of a Child Evangelism representative at Back-to-School nights would not result in any similar pressure to participate in a religious activity. Students would receive Good News Club flyers and permission slips, just as they have long received materials from a variety of other community groups. Receiving these materials would not pressure students to attend Good News Club meetings, and indeed they could not attend those meetings without their parents' written permission. Students would also occasionally see Good News Club materials, along with information about other groups, on school walls, but this

23

likewise would not pressure students to attend the meetings. Parents would see the Good News Club flyers and permission slips when (and if) their children bring them home, but they would not be pressured into reading those documents any more than they are pressured into reading other unsolicited mail, and receiving those materials would certainly not pressure parents into allowing their children to attend. In short, nothing even remotely approaching coercion is present in this case.

## VI.

In sum, we hold, based on undisputed facts in the record and well established Supreme Court precedent, that Stafford has clearly engaged in a practice of viewpoint discrimination that cannot be justified as an effort to avoid an Establishment Clause violation. We therefore affirm the order of the District Court and remand for the entry of permanent injunctive relief and such other relief as may be appropriate.